Filed 6/2/25  In re K.S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> V.W. et al., <br><br> Defendants and Appellants. | F088107 <br><br> (Super. Ct. No. 22CEJ300348-1) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Kevin G. Little, under appointment by the Court of Appeal, for Defendant and Appellant, V.W.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, S.S.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Dependency jurisdiction was taken over infant K.S. due to his sustaining several unexplained bone fractures. Mother, V.W., and presumed father, S.S. (collectively, "the parents"), were bypassed for reunification services, and, following a Welfare and Institutions Code[1] section 366.26 hearing, the juvenile court ordered adoption as K.S.'s permanent plan and terminated parental rights. Both parents appeal from the juvenile court's order terminating parental rights and other orders.[2]

On appeal, father argues the juvenile court erred by finding the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) did not apply to the proceedings because the department did not sufficiently discharge its duty of inquiry. Mother makes two claims pertaining to K.S.'s postreunification out-of-county placement that was made without the Fresno County Department of Social Services (department) providing the required statutory notice to the parents. Mother claims she was denied the opportunity to challenge this placement and that the juvenile court erred by excluding evidence related to K.S.'s placement at the section 366.26 hearing to prove department bias. Mother also argues the court erroneously excluded certain medical evidence from the section 366.26 hearing. Finally, mother argues the court erred by declining to apply the beneficial parent-child relationship exception to termination of parental rights. The parents join in one another's arguments.

Finding no error, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 12, 2022, when K.S. was approximately seven weeks old, his maternal grandmother noticed one of his arms was positioned lower than the other, and

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

[2]     The parents' notices of appeal list several orders but only raise issues pertaining to a few that we address in turn in this opinion.

his chest was poking out. The parents complied with her advice to take him to the hospital. At the hospital, K.S. was found to have sustained multiple physical injuries, including, but not limited to, an acute fracture to his right clavicle, multiple healing rib fractures, and buckle fractures to his right radius and ulna. The attending pediatrician was concerned about child abuse, and law enforcement and the department were contacted.

The parents had no medically reasonable explanation for the injuries. They both believed K.S.'s arm injury was caused by getting his arm stuck in the changing table guard. Mother thought the rib fractures may have been caused by their 40-to-50-pound dog jumping on the bed while K.S. was lying on it. No one saw the dog jumping on K.S., but the maternal grandmother, who was taking care of K.S. at the time, heard him scream from another room, and later saw him on the bed with the dog. The child advocacy doctor reported these explanations were not plausible causes of the injuries and had concerns of nonaccidental trauma. He explained the rib fractures were consecutive and more consistent with a human hand grabbing the child's ribs. He opined there were at least two incidents where K.S. experienced trauma.

A juvenile dependency petition was filed on behalf of K.S. on November 15, 2022. It was alleged he came within the juvenile court's jurisdiction pursuant to section 300, subdivisions (a) (serious nonaccidental physical harm by the parents), (b)(1) (failure to protect), (e) (severe physical abuse of child under five), and (i) (cruelty). K.S. was initially placed with his maternal great-aunt.

K.S. was ordered detained from the parents on November 16, 2022, with supervised visitation to occur at a minimum of twice per week.

In December 2022, the maternal great-aunt advised the department she was not able to adopt K.S. The paternal and maternal grandmothers were provided information

3.

regarding the placement process. Law enforcement informed the department the criminal case had been suspended as it could not be determined who was at fault.

Further investigation into the cause of K.S.'s injuries revealed K.S. had normal calcium levels and tested negative for osteogenesis imperfecta (OI) aka brittle bone disease and other genetic diseases. K.S. had low Vitamin D levels, which later elevated to the normal range after taking supplements.

The parents visited with K.S. and participated in parenting classes on their own. Later, they advised the department they had begun participating in therapy but were not willing to share any private information related to their treatment with the department.

The department recommended the parents be bypassed for family reunification services because they met the criteria for section 361.5, subdivision (b)(5) (child came under court's jurisdiction under § 300, subd. (e) because of conduct of parent) and (b)(6) (child came under court's jurisdiction because of severe physical abuse and services would not benefit child).

A contested combined jurisdiction/disposition hearing was conducted on May 17, 2023. The juvenile court found all the allegations true and that K.S. was described by section 300, subdivisions (a), (b), (e), and (i). The court adjudged K.S. a dependent of the court; ordered, pursuant to section 361.5, subdivision (b)(5) and (b)(6), that the parents would not receive reunification services; and set a section 366.26 hearing. The parents' visitation order was changed to a minimum of two supervised visits per month.

The parents filed petitions for extraordinary writ, which this court consolidated. Together, the parents contended the juvenile court erred by: (1) failing to permit father's expert physicians to testify via video or telephone at the hearing; (2) failing to appoint an expert for father and permit rebuttal testimony; and (3) failing to relieve minor's counsel at father's request. (*V.W. v. Superior Court*, F086300.) Notably, and somewhat relevant to the issues on appeal, the petitions did not challenge the sufficiency of the evidence of

4.

any of the juvenile court's jurisdictional or dispositional findings or orders. By written opinion, this court denied the petitions for extraordinary writ, finding none of the parents' contentions had merit.

The department's section 366.26 report dated August 31, 2023, recommended adoption as K.S.'s permanent plan and that parental rights be ordered terminated. The report indicated that K.S. had been moved to a nonrelative home[3] on May 18, 2023, because his relative placement had been unable to provide a permanent concurrent plan. The report further outlined efforts the department made to place K.S. with another relative subsequent to K.S.'s nonrelative placement. One paternal relative inquired about the Resource Family Approval (RFA) process but did not submit an application. The paternal grandmother participated in the RFA process and was assessed for placement but placement was ultimately not recommended because it was reported she was a suspect in the abuse of K.S., and she later withdrew her application.

The report further indicated the parents visited with K.S. regularly and the visits went well. K.S. would cry when removed from his care providers care and continue crying for a second after being handed over to the parents. The parents were interactive, engaged, attentive, and affectionate toward K.S. K.S. did not show signs of emotional distress at the end of visits.

The department opined it would not be detrimental to terminate parental rights. It was noted K.S. had a "healthy, nurturing and positive parent-child relationship" with his care providers, and they wished to adopt him. He had been with them since he was about seven months old, and they had made sure he attended all of his doctor's appointments. K.S. was observed to be happy and well-adjusted in his placement. It was further opined

---

[3]     This was the out-of-county placement mother now challenges on appeal.

severing the parent-child relationship between K.S. and the parents would not cause emotional instability, and K.S. was thriving in his placement.

On September 11, 2023, mother filed a section 388 petition requesting a new jurisdiction/disposition hearing based on "[m]edical records not considered by the court" that showed K.S. "has medical conditions unrelated to abuse and that his injuries that led to [the department's] involvement were birth related." The petition did not explain with more specificity what the medical records stated or why they were not presented to the court at the jurisdiction/disposition hearing in May. No documents were attached to the petition. The request was summarily denied the next day based on the court's finding the request did not state new evidence or changed circumstances.

On October 19, 2023, mother filed a section 827 petition to access medical records and allow three separate experts to review them: Dr. Alex Karimi, a mental health practitioner; Dr. Niran Al-Agba, a pediatrician; and Dr. Kenneth W. Martin, a radiologist. On November 3, 2023, the juvenile court ordered certain documents to be released to Dr. Karimi and denied mother's request as to the other two doctors because it found their expertise was not relevant to the proceedings.

On March 27, 2024, mother filed a "request to revoke unlawful out of county foster/resource placement" (unnecessary capitalization omitted) based on her assertion the department had failed to provide notice of the placement change as required by section 361.2, subdivisions (g) and (h) and that the placement had interfered with K.S.'s relationships with relatives and parent visitation.

At a settlement conference the following day, county counsel objected to mother's request as to the out-of-county placement as untimely because she had known about the placement for six months. Mother's counsel's position was that the request was timely because mother never received the required statutory notice. The court indicated it would take the matter up at the next settlement conference on April 11, 2024.

On April 11, 2024, the court indicated it had done "a lot of research" into the placement issue and asked county counsel whether the department had ever filed a case plan indicating the reasons for the out-of-county placement as required by section 361.2, subdivision (g). County counsel indicated she was unsure but went on to explain the parents were provided informal notice at past Child and Family Team, or CFT, meetings. County counsel further explained that "formal notice" was not provided "due to the safety issue that had resulted with the child remaining in county, including the fact that the relatives and the family absconded with the child after the disposition hearing, so it was an emergency change in placement." County counsel further argued that mother had used an "improper legal mechanism" to raise her objection and again that it was untimely.

Minor's counsel stated he agreed with county counsel and added that even if the department had not complied with section 361.2, the statute contained no remedy. He argued changing K.S.'s placement would not be in his best interests, noting K.S. had been in his placement for 11 months, and his care providers were who he saw as "the most stable and loving people in his life."

Mother's counsel argued that the juvenile court had jurisdiction to ensure compliance with dependency statutes and "when looking at this could say that [the statute] was intentionally disregarded perhaps, which is trouble."

The court found the department did not comply with the statute but agreed with minor's counsel regarding a remedy, noting its main responsibility was to look out for the child's best interest and found it was not in K.S.'s best interest to change his placement as it had occurred so many months ago.

After the court ruled, mother's counsel argued that the department intentionally sought to interfere with visitation by moving K.S. "so far from [the parents]" and asserted that the care providers were identified "long before the disposition hearing." In response, the court asked whether the parents had received visits, and mother's counsel represented

7.

the department was consistently opposing more frequent visitation because of the distance of the foster parents. Minor's counsel noted that the parents and K.S. had been visiting "twice the minimum amount of time" because they have been visiting "two hours twice per month" rather than one hour twice per month. The court stated its placement order would remain the same, and issues regarding interference with reunification would be related to bonding between the parents and the child and more appropriately heard by the trial court.

The contested section 366.26 hearing occurred over the course of seven days. The department called social worker Anna Harvey. Harvey testified that K.S. was deemed adoptable due to his young age and the absence of any significant developmental or behavioral issues. He was also considered adoptable due to his care provider's desire to adopt him, and he was bonded and safe in that placement. Based on Harvey's observations of visits between K.S. and the parents, she opined that K.S. was familiar with them but did not seek them to meet his needs. He played with them but did not show a lot of affection or reach out to them in an emotional way. Harvey did not believe K.S. would experience any emotional detriment if parental rights were to be terminated. To the contrary, she felt it would be detrimental if K.S. were to leave his current placement due to the attachment and connection he had with his care providers.

The parents[4] called several family members and friends. These witnesses testified that the parents were very excited when mother learned she was pregnant with K.S. The parents loved K.S. very much and were very careful with him, and the witnesses who testified never observed any abuse or neglectfulness.

Psychologist Alexander Karimi also testified on behalf of the parents. He observed around 10 visits between K.S. and the parents and opined they had a parent-

---

[4]     While the parents had been represented by separate counsel, they were represented by shared counsel at the section 366.26 hearing.

child bond, as evidenced by the way K.S. hugged the parents, touched their faces, and played with mother's hair when she was holding him. Karimi's observations indicated to him that K.S. had substantial, positive, emotional attachments to the parents based on the way K.S. played with them, that he did not get tired or cried during visits, and was happy falling asleep in their arms. He further testified it was always detrimental to terminate a child's attachment to biological parents.

The parents also called two individuals who supervised visits between them and K.S.: Diane Niswander and Angela Gutierrez. Niswander testified she observed mother was able to soothe K.S. when he was crying and that the parents participated in educational activities with K.S. and fed him. She testified they were affectionate though she "couldn't tell you whether or not [K.S.] was aware of even who they were, to be honest with you. Somebody he obviously saw on occasion." Gutierrez testified the parents were very interactive and careful with K.S., and the whole family appeared happy during visits. She sometimes wondered why the family was involved in a dependency proceeding because of how loving the parents were toward K.S.

Finally, the parents testified on their own behalf. Mother testified that she and father were excited to become parents and excited about K.S.'s birth. K.S. was born with club feet which required many medical appointments. None of the medical providers told them he had any broken bones. Before K.S.'s removal, mother was a stay-at-home mom, and father would take over when he got home from work in the afternoon. When K.S. was born, she was concerned about COVID-19 and RSV, so she tried to limit his exposure to those illnesses. She kept extensive records regarding things like breastfeeding/pumping and diaper changes. She did not abuse K.S. Before K.S. was removed, they bonded by her singing to him and just staring at each other.

Mother further testified she and father started seeing Dr. Karimi for therapy and participated in several services on their own. They completed parenting classes, first aid,

9.

CPR training for adult and child, and were currently taking emotional regulation/anger management classes.

Since K.S. had been removed, mother felt their bond had continued because K.S. was comfortable around them, took naps with father, recognized their voices, and reached out to touch them. She felt he was confused when he had to leave visits. When asked what negative repercussions K.S. would suffer if he stopped seeing the parents, mother responded, "I feel like with any child when you rip them from their family they lose all their roots.… I'm sure that there's a lot of foster kids that would want to go back and look for their parents."

Father testified he and mother were excited to have K.S. and prepared for his birth by preparing their home, obtaining supplies, and getting advice from his parents and YouTube videos to make sure everything was ready for K.S.'s arrival. He felt a connection with K.S. ever since mother was pregnant with him, and he felt their bond became stronger over time. He did not abuse K.S. and investigated what could have caused K.S.'s injuries, including taking a trip to Boston to meet with a Vitamin D specialist. At visits, he and mother cleaned K.S., changed his diaper, and brought teething toys for him. K.S. was always smiling, laughing, and having a good time, just like when they had him in their care. Father felt severing their relationship would be detrimental to K.S. because he thought K.S. would get teased for not being with his biological parents. He was also concerned about K.S. not having access to family history regarding his club feet as it runs in his family.

Social Worker Harvey testified in rebuttal for the department that she did not observe K.S. to be confused after visits. She stated that he occasionally reached for father to pick him up but not that often and she had not observed K.S. playing with the parents' hair.

Following the presentation of evidence, county counsel argued K.S. was adoptable and that the beneficial parent-child relationship exception to termination of parental rights did not apply. K.S.'s counsel stated he was in agreement with county counsel. The parents' counsel made no arguments disputing that K.S. was adoptable and argued that the beneficial parent-child relationship exception applied.

The court delivered its ruling on May 17, 2024. The court found by clear and convincing evidence that K.S. was adoptable. As for whether the beneficial parent-child relationship exception to termination of parental rights applied, the court found the parents regularly and consistently visited K.S. It further found the relationship between K.S. and the parents was "99 percent" positive. As for whether K.S. would suffer detriment to justify not ordering adoption, the court noted it weighed and considered all of the evidence, particularly the testimonies of Dr. Karimi, the parents, Social Worker Harvey, and observations by previous social workers on the case. The court determined the parents had not met their burden of showing by a preponderance of the evidence that the harm to K.S. from severing the parent-child relationship outweighed the security, finality, and stability of adoption.

The court ordered adoption as K.S.'s permanent plan and ordered parental rights terminated.

## DISCUSSION

### I. ICWA

#### A. Legal Background

Under California's statutory scheme to comply with ICWA, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian

child."[5]  (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court,[6] rule 5.481(a).)  The agency's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b)(2).)

When initial inquiry gives rise to a "reason to believe"[7] (but not sufficient evidence to determine there is "reason to know"[8]) that an Indian child is involved in a

---

[5]      An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

[6]      All further rule references are to the California Rules of Court.

[7]      "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe.  Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated" in section 224.2, subdivision (d)(1)–(6).  (§ 224.2, subd. (e)(1).)

[8]      These enumerated grounds for "reason to know" are:  "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [¶] [and/or] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."  (§ 224.2, subd. (d); see 25 C.F.R. § 23.107(c) (2025).)

proceeding, "further inquiry regarding the possible Indian status of the child" is required, which includes gathering additional biographical information from family members and contacting relevant tribes. (§ 224.2, subd. (e)(2)(A)–(C).)

The department "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." (Rule 5.481(a)(5).) Before finding ICWA inapplicable, the juvenile court must make a finding that the department conducted "proper and adequate further inquiry" and exercised "due diligence" in doing so, and that "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

### B.    *Additional Procedural Background*

Here, the record indicates the department made or attempted initial inquiry of the following maternal relatives: mother, maternal grandmother, maternal great-aunt, maternal grandfather, two maternal great-grandmothers, and a maternal great-uncle.

Maternal relatives claimed Apache, Blackfeet, Choctaw, and Cherokee ancestry, and the department prepared ICWA-030 forms and sent them to several tribes in compliance with their duty of further inquiry. Responses received from the tribes were filed with the juvenile court, and none of the responses gave reason to know K.S. was an Indian child within the meaning of ICWA.

Prior to the section 366.26 hearing, the department documented initial inquiry of the following paternal relatives: father, paternal grandmother, and paternal great-grandfather, none of whom claimed any Native American ancestry. At the section 366.26 hearing, several paternal relatives testified, and the department conducted inquiry of them on the record, including paternal great-grandmother (on father's mother's side), paternal

13.

uncle, paternal step great-grandfather,[9] and paternal grandmother. The paternal uncle and paternal grandmother claimed no Native American ancestry. The paternal great-grandmother testified that she heard "years and years ago" that a relative had Native American ancestry but she never knew a tribe and "[t]hey were never registered or anything." She explained any ancestry would be three or four generations back, and she did not have the name of the relative. She further testified she did not know of any relatives who lived on a reservation or went to a Native American school. The paternal step great-grandfather testified there was "talk of" Native American ancestry, but he was not aware of any tribe or anyone who resided on a reservation, attended a Native American school, or had an enrollment number.

The court made no specific ICWA findings on the record at the section 366.26 hearing but had previously found ICWA did not apply at the jurisdiction/disposition hearing conducted on May 17, 2023.

### C.    *Analysis*

We review the juvenile court's implied finding that there is no reason to know whether a child is an Indian child for substantial evidence, and the court's implied finding that the department has conducted a proper and adequate inquiry and due diligence for abuse of discretion. (*In re K.H.* (2022) 84 Cal.App.5th 566, 600–601 (*K.H.*).)[10]

Father argues the department did not conduct an adequate inquiry because they did not conduct any inquiry of the paternal grandfather, S.S., Sr., and an unnamed paternal

---

[9]    It appears he is married to the paternal great-grandmother who testified, as they have the same last name.

[10]    Father insists the proper standard of review is substantial evidence. Under either the substantial evidence standard or the abuse of discretion standard, we find no error. (See *In re Caden C.* (2021) 11 Cal.5th 614, 641 [noting there is likely "no practical difference" between application of substantial evidence and abuse of discretion standards of review].)

14.

relative mentioned in one of the department's reports. In his opening brief, father additionally asserted the department did not make inquiry with the paternal grandmother, the paternal great-grandmother, the paternal uncle, and the paternal great-grandfather. However, in its respondent's brief, the department correctly pointed out the record indicated these relatives were asked about Native American ancestry during the section 366.26 hearing, as stated above. Father acknowledges he initially overlooked this, but contends in his reply brief that the inquiry of these relatives was nonetheless inadequate because the department was required to conduct additional questioning. In reviewing the record, we find no error.

The court could have reasonably determined the department's initial inquiry was adequate. Regarding the juvenile court's discretion in evaluating the agency's inquiry efforts, this court explained in *K.H.*, "so long as the agency conducts a reasonable inquiry and documents its results, the juvenile court will have the room to exercise its discretion in determining whether the agency's efforts are sufficient to satisfy the mandates of ICWA and related California law." (*K.H.*, *supra*, 84 Cal.App.5th at p. 604.) "The agency's inquiry must extend far enough to reasonably ensure that if there is information the child is or may be an Indian child, that information is gathered." (*Ibid.*)

Here, the juvenile court could have reasonably concluded that the department's initial inquiry was of a sufficient reach to "satisfy the mandates" of ICWA. The record indicates direct, lineal relatives of both sides of the maternal and paternal families, going back three generations were asked about Native American ancestry. The two paternal family members who were not inquired of did not compel the court to find inquiry was inadequate. As for the paternal grandfather, the court could have reasonably determined the response of his father, the paternal great-grandfather, that K.S. had no Native American ancestry, was sufficient to determine there was no reason to believe or know K.S. was an Indian child based on ancestry from the paternal grandfather's side of the

family. As to the unnamed paternal relative, as the department points out, the record indicates this relative appeared to be a paternal second cousin. The juvenile court could have reasonably determined inquiry of this relative was not crucial to the determination of whether K.S. was an Indian child since family members from K.S.'s direct ancestral line were adequately inquired of. While we encourage the department to make ICWA inquiry of every family member it encounters, under the circumstances of the present case, we find the court did not abuse its discretion in declining to require this.

Father also argues that the inquiry of the paternal relatives who testified at the section 366.26 hearing was not sufficiently thorough. Specifically, father argues that the department failed to ask the paternal relatives who else may have information or other unspecified follow-up questions. Father has not set forth a statutory requirement of more thorough questioning than what was done in the present case. The department's duty of initial inquiry requires them to ask "whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).) Here, county counsel asked paternal relatives several questions about indicia related to whether K.S. is or may be an Indian child, including whether any known relatives were enrolled in tribes, had lived on reservations or tribal land, or attended Native American schools. The court was reasonable in determining the questioning done at the section 366.26 hearing satisfied the department's statutory requirement. The court could have also reasonably determined none of the paternal family members' responses triggered a duty of further inquiry. While the great-grandparents gave vague indications they might have Native American ancestry, they nor any other relatives, gave specific information that indicated any of the specific criteria set forth in section 224.2, subdivision (d) may have been true, or anything else giving any reason to believe K.S. was an Indian child within the meaning of ICWA. (See § 224.2, subd. (e)(1).)

16.

For these reasons, we conclude the court did not abuse its discretion in determining the department's inquiry was adequate, and we find no error in its determination that ICWA did not apply.

## II.  Out-of-County Placement

Mother argues she was "denied an opportunity to challenge the illegal placement of K.S. either before, during or after the 366.26 hearing, and it beared [*sic*] upon many important issues."  (Unnecessary capitalization omitted.)  We find no error.

### A.  *Legal Background*

Mother's claim that K.S.'s placement was "illegal" stems from section 361.2. Section 361.2, subdivision (g)(1) provides that when a child is removed from their parents' physical custody, unless the child is placed with relatives, the child "shall be placed in foster care in the county of residence of the child's parent … in order to facilitate reunification of the family."  Section 361.2, subdivision (g)(2) provides that if no appropriate in-county placements are available, "a placement may be made in an appropriate place in another county, preferably a county located adjacent to the parent's … community of residence."  If out-of-county placement is deemed necessary, "the specific reason … shall be documented in the [child's] case plan."  (§ 361.2, subd. (g)(4).)

Section 361.2, subdivision (h)(1) provides:

> "[I]f the social worker must change the placement of the child and is unable to find a suitable placement within the county and must place the child outside the county, the placement shall not be made until the social worker has served written notice on the parent … at least 14 days prior to the placement, unless the child's health or well-being is endangered by delaying the action or would be endangered if prior notice were given.  The notice shall state the reasons that require placement outside the county.  The child or parent … may object to the placement not later than seven days after receipt of the notice and, upon objection, the court shall hold a hearing not later than five days after the objection and prior to the placement.  The

17.

court shall order out-of-county placement if it finds that the child's particular needs require placement outside the county."

The notice required prior to placement "may be waived if the child and family team has determined that the identified placement is in the best interest of the child, no member of the child and family team objects to the placement, and the child's attorney has been informed of the intended placement and has no objection." (§ 361.2, subd. (h)(2)(A).)

## B.    *Analysis*

As stated above, K.S. was initially placed with a relative. He was moved to a nonrelative placement out of county on May 18, 2023, after the relative informed the department she would not be able to provide a permanent plan for K.S., as well as after the parents were bypassed for reunification services. The department did not place the reasons for the placement in K.S.'s case plan, and did not provide any written notice to the parents prior to the move. It also appears the county in which K.S. was placed was not an adjacent county. On March 27, 2024, the parents filed a request to "revoke" K.S.'s out-of-county placement. On April 11, 2024, the court denied the request, despite finding the department had not complied with the notice requirements of section 361.2, because changing placements was not in K.S.'s best interests.

### 1.    Mother's Claim She Was Denied an Opportunity to Challenge the Placement is Not Supported by the Record

We reject mother's claim she was denied an opportunity to challenge the placement. Though the parents were not provided proper notice initially, at the April 11, 2024 settlement conference, the court considered mother's request to move K.S. It heard from the parties on the issue, inquired into whether the department complied with

18.

section 361.2 with regard to notice, and found they did not, but nonetheless determined it was not in K.S.'s best interest to move placement despite the department's failings.[11]

It is not clear from her briefing exactly what mother felt this hearing was lacking to support her claim she received *no* opportunity to challenge K.S.'s placement but she does suggest she should have been permitted to present evidence of department bias in relation to this placement at the hearing. However, as we explain below, the juvenile court correctly determined the issue before it was limited to whether changing K.S.'s placement was in his best interest.[12]

---

[11]     Notably, this was done without determining whether mother's objection was timely. There are several inferences we can make from the record of when the parents received actual or constructive notice of K.S.'s out-of-county placement. However, it was expressly mentioned in open court on February 20, 2024, so this is the latest possible date the parents would have received actual notice that K.S. resided out of county. Mother's request to "revoke" the out-of-county placement was not filed until March 27, 2024, over a month later.

Objections to a properly noticed intention to move a child out of county must be made within seven days. (§ 361.2, subd. (h).) We believe a timely objection to an out-of-county move that occurs without proper notice should be comparable, that is at least as close as possible to seven days after actual notice. While mother's position appears to be that a parent is excused from making a timely objection when they do not receive statutorily required notice, time is of the essence when it comes to a young child and if there is a legal objection the parents can make that could result in a placement disruption, we believe it should be made as soon as possible. Here, we need not determine whether mother's objection was timely, as the court considered mother's request, but the time the parents took to object was certainly a factor the court could consider as it related to K.S.'s best interest and how long he had been stable in his placement.

[12]     We acknowledge the court stated the bias evidence mother wished to present would be more appropriately considered at the section 366.26 hearing under the assumption that such evidence could be relevant to the bond between the parents and K.S., but as we explain below with regard to mother's evidentiary challenge, after hearing mother's offer of proof, the trial court reasonably determined the specific evidence she sought to introduce was not relevant, and the trial court was not bound by another judge's comments regarding what the evidence may or may not show.

19.

## 2. The Court's Decision Not to Change K.S.'s Placement was Proper

When considering whether out-of-county placement is appropriate, the statute requires the court to order the out-of-county placement "if it finds that the child's particular needs require placement outside the county," but no other specific considerations are listed specifically in section 361.2, subdivision (h)(1). General factors the department must ensure are met by a placement include whether the care provider is able to provide for the day-to-day needs of the child and maintain "the least restrictive family setting that promotes normal childhood experiences," and whether the child is permitted to engage in reasonable, age-appropriate day-to-day activities that promote normal childhood experiences. (§ 361.2, subd. (k).)

Generally, when a change of placement is recommended to the juvenile court, that court must act in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Whether a previous placement should be changed is a decision resting in the sound discretion of the juvenile court. Its exercise of discretion will not be overturned on appeal unless an abuse of discretion is clearly established. (*Id.* at p. 318.)

Here, the court's determination that K.S. staying in his placement was in his best interests was reasonable and not an abuse of discretion. K.S. was doing well in his placement and had been there for much of his short life. Mother argues the move interfered with her ability to reunify with K.S., visit with him more often, and/or prove the beneficial parent-child relationship exception applied. However, at the stage of the proceedings the challenge was made, the court's focus was properly on K.S.'s right to stability and permanence. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 304 [once reunification services are terminated, the focus of the dependency case shifts away from reunification to providing a permanent, stable placement for the children].)

The juvenile court considered whether visitation was improperly interfered with and reasonably determined the parents' arguments that they were not receiving more

20.

frequent visitation did not justify moving K.S. What constitutes reasonable visitation turns on the circumstances of the individual case. (See *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1010.) The court ensured the parents were receiving at least the minimum amount of visitation ordered at the disposition hearing, which the record confirms,[13] and again, the court acted reasonably by focusing not on reunification but what the proper permanent plan for K.S. would be. Moreover, mother's assertion that the department would have increased visitation if K.S. were placed closer was speculative and unlikely given the postreunification posture of the case.

While we acknowledge the parents wished to have K.S. placed with relatives, there was no compelling evidence presented that there were relatives willing and able to take immediate placement. To the contrary, the department's section 366.26 report indicated the department had been working on placing K.S. with relatives, but at that point in the proceedings, none had successfully completed an assessment.[14] The report also set forth that the care providers were providing for all of K.S.'s day-to-day physical, social, and emotional needs. The parents did not offer any evidence or make any indication that the care providers were unable to do so.

### 3. Conclusion

We note nothing in our opinion is intended to endorse the department's conduct. We acknowledge they failed to comply with section 361.2, and the reasons for their failure are not clear from the record before us. However, the juvenile court was required to put K.S.'s best interest first in making its placement determination. At the time the issue was brought to the court's attention, K.S. was doing well in a safe placement where

---

[13]     The parents did not at any point challenge the visitation order that was in effect, despite filing a petition for extraordinary writ.

[14]     Notably, the parents do not argue on appeal that the relative placement preference in section 361.3 was not complied with, and it does not appear the parents or any other relative requested a hearing on relative placement.

21.

he had been for most of his short life—longer than he was with his parents or with his relative care provider. By our reading of the record, the length of his placement was certainly due to the department's initial failure to comply with the notice provisions of section 361.2 but was also caused by the parents' failure to raise the issue sooner, allowing K.S. to become more and more attached to his care providers at a time when reunification was no longer the court's primary focus. Mother's position both below and on appeal seems to be that because the department failed to comply with the notice provision of section 361.2, K.S. should be moved without any evaluation of his best interest or any available and capable relative willing and approved to take placement. She provides no authority to support this position. This is not to say a department's failure to comply with the notice provisions of section 361.2, subdivisions (g) and (h) should never result in moving the child to an in-county placement, but under the circumstances of this case, the juvenile court acted appropriately.

We acknowledge that what transpired was not perfect, but the juvenile court correctly focused on what was in K.S.'s best interests at the time of mother's request despite prior error. (See *In re M.V.* (2022) 78 Cal.App.5th 944, 971, fn. 9 [where dispositional findings were made in error, and the orders were reversed and the matter remanded, juvenile court was directed to "make its decision based on the facts existing at the time of the further proceedings"]; *In re R.T.* (2015) 232 Cal.App.4th 1284, 1308 [where error in not properly applying relative placement preference, upon remand court must evaluate child's best interest under "circumstances as they exist at the time" of remand]; see also *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 ["The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests"].)

22.

**III.    Challenged Evidentiary Rulings**

Mother makes two challenges to the court's section 366.26 evidentiary rulings. She argues the juvenile court erred by:  (1) not permitting the parents to introduce evidence of department bias as, according to the parents, especially demonstrated by the department's failure to comply with the notice provisions set forth in section 361.2 and (2) by excluding certain medical evidence.  We find no error.

*A.    General Legal Principles*

The juvenile court has broad discretion to control the proceedings before it. (§ 350, subd. (a)(1); *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 758.)  It is thus "reasonable for the court, in pursuit of its statutory duties, to ascertain the issues relevant to the hearing and make some relevancy determinations.  That power should be exercised in such a manner as to make clear for all an identification of the issues and a recognition that time is not an unlimited commodity in today's busy juvenile courts." (*Id*. at p. 760.)

At a section 366.26 hearing, the court shall review the report prepared by the department and "receive other evidence that the parties may present."  (§ 366.26, subd. (b).)  " 'While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings "are not entitled to full confrontation and cross-examination." [Citation.]  Due process requires a balance.  [Citation.]  The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will "necessitate undue consumption of time." (Evid. Code, § 352.)  The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.' " (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733.)

23.

In juvenile dependency cases, "[t]he trial court is vested with broad discretion in ruling on the admissibility of evidence. [Citations.] ' "[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion." ' [Citation.] ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " ' " (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121.)

Relevant to the court's relevancy determinations is that "the sole purpose of the section 366.26 hearing is to select and implement one of the [statutorily enumerated] permanent plans." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 304.)

### B. *The Court Did Not Err by Excluding the Parents' Evidence of Asserted Department Bias*

#### 1. <u>Additional Procedural Background</u>

In their statement of contested issues prepared for the contested section 366.26 hearing, the parents' sought to address the "longstanding bias" of the department. At the section 366.26 hearing, before the court heard the evidence, the parties had a lengthy discussion on the record with regard to whether the parents would be able to offer evidence proving department bias. As summarized in mother's briefing, counsel provided an offer of proof regarding:

> "the Department's history of bias against the parents … which included:
> (1) the assigned social worker laughing in Mother's face after the jurisdiction-disposition ruling, (2) the recruitment of a remote foster family even before the ordering of bypass, at a time when the case plan was for relative adoption, (3) having the intended remote adoption as the motivating reason for refusing to stipulate to the remote testimony of Mother's expert despite his cancer condition, (4) intentionally violating [section] 361.2 in effectuating the illegal placement without notice, for the purpose of weakening the parents' bond and limiting visitation, (5) minimizing the parents progress toward reunification in reports, (6) the social worker's relying on a questionable and unverified statement from an a law enforcement officer to exclude consideration of any family member [particularly the paternal grandmother] for possible placement, (7) overstating the quality of K.S.'s bond with the foster parents while at

24.

the same time minimizing the displayed bond between the parents and K.S. during visits, (8) failing to provide the parents with regular, noticed visits, and (9) continued refusal of eligible family members for possible placement."

Counsel argued this evidence was relevant to "adoptability"; whether "the solution of relative guardianship is insufficient or is sufficient as an alternative to adoption"; whether the parents had made significant progress in addressing issues requiring removal; and the issue of parent-child bonding. Counsel also pointed the trial court to the comments of the judge who presided over the hearing on April 11, 2024, wherein she stated, "If [parents' counsel] has evidence that the Department has in any way intentionally prevented a relationship that could be an exception to terminating parental rights, then [parents' counsel] can bring that evidence to the trial court and I believe that's something that they would like to hear and would like to consider in deciding the matter."

In ruling on the parents' request, the court stated under Evidence Code section 352, it did not want to stray from the issues of adoptability and whether an exception to termination of parental rights applied. The court stated its tentative ruling was to limit any evidence of bias to impeachment. The court noted the parents' position appeared to be that the evidence was relevant to the issue of "whether or not they got a fair shot at bondability…. But in my reading of the [section 366.26] law, I don't think this is the place to do that," and noted the parents should have filed something such as a section 388 petition earlier. The court stated it would rule on the parents' specific witnesses as they came up in the proceedings.

As mother notes, throughout the hearing, the court sustained objections based on relevance and Evidence Code section 352 grounds to several of the parents' counsel's questions primarily regarding the social worker's efforts to place K.S. with family members and K.S.'s placement out of county.

25.

### 2.     Analysis

We cannot say the court's rulings on the evidence the parents sought to admit to prove department bias was an abuse of discretion or violated the parents' due process rights.  The court heard ample argument on the issues and concluded the general evidence of the alleged pattern of bias was not directly relevant to the issues of adoptability or whether a statutory exception to termination of parental rights applied except as it related to witness impeachment.  This was reasonable, and mother's arguments to the contrary are unpersuasive.

Mother argues the proffered bias evidence went to the credibility of the department's section 366.26 reports and recommendations, specifically the department's "assessment that the parents were making minimal progress and therefore not deserving of reunification services, the observations of the parents' interaction with K.S. during visits, and K.S.'s relationship with the foster parents."  However, the juvenile court's ruling *allowed* bias evidence for the purposes of impeachment, and deferred its ruling on that issue to specific witnesses.  Mother has pointed us to no specific instance in the record where she was not permitted to use bias evidence to impeach a witness or challenge the credibility of the department's report nor has she explained how that ruling affected the outcome of the hearing.  In her reply brief, she briefly asserts "in practice [the court] sustained objections to questions aimed at establishing departmental bias even when they involved the credibility of witnesses" but provides no citation to the record.  Mother further states potential witness Debra Chavira, "who would have been presented only to prove bias, w[as] disallowed altogether."  The citation she provides to support this assertion does not contain a ruling that Chavira's testimony would be excluded; it contains the department's objection to her testimony and the court deferring ruling on its admission or exclusion.  Mother has failed to demonstrate error on this point.

Mother also argues evidence showing alleged department bias through their actions regarding K.S.'s placement demonstrated mother was prevented from being able to prove an exception to termination of parental rights applied, but this claim is tenuous and reliant upon speculation. Mother first contends that "relative placement would have been prioritized at the 366.26 hearing but for the illegal out-of-county foster placement." Her reply brief gives more insight into her logic; she contends "Had K.S. been placed with relatives pending final RFA approval, the exception to termination of parental rights under §366.26(c)(1)(A) would have applied."[15] Mother goes on to argue that, alternatively, if K.S. had not been placed out of county, mother would have had a better chance of proving the beneficial parent-child relationship exception applied, as she would have had more opportunities to visit K.S. These contentions are wholly speculative and do not justify the admission of what the department did or did not do with regard to placement at the section 366.26 hearing. The court's decision not to hear about these issues was not arbitrary, capricious, or absurd nor did it exceed the bounds of reason.

Mother's general assertion that "placement is absolutely an issue for the court to decide" at a section 366.26 hearing is not persuasive. To support this contention, she cites *In re Maria Q.* (2018) 28 Cal.App.5th 577. *Maria Q.* is inapposite. It addresses a relative's request for placement after a section 366.26 hearing has been conducted and a dependent child remains in foster care. Mother does not make any reasoned argument as to how *Maria Q.* applied at the stage of the proceedings in the present case, and does not

---

**15** The exception reads: "The child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of their relative would be detrimental to the emotional well-being of the child." (§ 366.26(c)(1)(A).)

27.

persuade us that the court was compelled to find the questions regarding the department's actions regarding K.S.'s placement were relevant to the section 366.26 hearing issues.

For the foregoing reasons, we find no error in the juvenile court's rulings on proffered evidence showing department bias towards the parents.

### C.       *The Court Did Not Err by Excluding the Parents' Medical Evidence*

Mother also claims her statutory and constitutional rights were violated when she was prevented from presenting "medical evidence."  Her claim is based on three separate actions by the juvenile court:  (1) the order denying mother's September 11, 2023 section 388 petition made on September 12, 2023; (2) the order partially denying mother's October 19, 2023 section 827 request for access to the juvenile case file for review by medical experts made on November 3, 2023; and (3) the order made during the section 366.26 hearing excluding testimony of Dr. Niran Al-Agba.

As a threshold matter, we do not have jurisdiction to review the first two of mother's challenges.  The notice of appeal was filed May 23, 2024, over 60 days after the orders were made.  (See *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time to file an appeal has passed]; rule 8.406(a)(1).)

Moving to mother's assertion that the court erred by not allowing Dr. Al-Agba to testify, we find she has demonstrated no error.

### 1.       <u>Additional Procedural Background</u>

During the section 366.26 hearing, after Dr. Karimi's testimony, the parents' counsel requested permission to call Dr. Niran Al-Agba to testify because Dr. Karimi "was questioned [by county counsel] about the specific nature of the abuse and who caused it and those sorts of things."  It appears the questioning by county counsel to which the parents' counsel was referring occurred on cross-examination of Dr. Karimi and related to whether a parental bond would be affected if the parents or someone

28.

known to the parents were to have inflicted injuries on the child. County counsel also asked Dr. Karimi what his understanding was of why K.S. was removed from the parents' care.

The court responded to the parents' request by saying, "Okay. I'll be frank with you, I didn't take those questions—I think it was to the depth of knowledge as to Dr. Karimi, why he was here, and trying to determine, you know, what did you know about coming—about this case prior to testifying here and the purpose. And that's the only way I understand he was being questioned. I didn't see it getting to the medical at all. It was just as to the nature and the underlying basis for the removal of the child." County counsel confirmed her questions regarding Dr. Karimi's knowledge of the case was to determine whether the sustained jurisdictional allegations affected his opinion, explaining, "It was for impeachment, not opening the door or arguing the jurisdictional facts." The court denied parents' counsel request for Dr. Al-Agba to testify, specifically stating "we need not get into the medical aspects of the underlying injuries that caused the removal."

The court then allowed the parents' counsel to make a further offer of proof,[16] and he stated that Dr. Al-Agba would testify based on hypotheticals "that a buckle fracture, the type of fracture that [K.S.] had on his wrist, is not an abuse-type injury, it's an impact injury. The classic buckle fracture is if somebody, for whatever reason, gets—ends up going over the handle bars of their bike, sort of thing. It's not—nothing that comes from twisting, pulling, or—or punching or bending, and that there's—the injuries that he sustained, these fractures, could all very easily have come from unintentional contact. More—moreover, there's no indication, based on these fractures, as again, based on the

---

[16]     A previous offer of proof filed by mother indicated that "it is anticipated that Dr. Al-Agba will testify that [K.S.] was not an abuse victim, and, to the contrary was well cared for by his parents, and that his physical condition at the time of removal is reflective of a close and loving bond between him and his parents."

29.

hypotheticals that a caregiver would have immediately noticed these. So that's what she would testify." The court responded, "Okay. Thank you. And the record will so reflect the Court's ruling remains the same, and that is we won't litigate the injuries. The probative value for purposes of findings and rulings the Court has to make in the 366.26, it's not as probative, in the Court's opinion, as to that vis-à-vis position Counsel for the parents takes with regard to the questions posed by the County and Dr. Karimi or anything posed to Dr. Karimi by Counsel for the child as well."

##### 2. Analysis

We find no abuse of discretion. The juvenile court's interpretation of the nature of county counsel's questioning and determination that it did not open the door to the issue of whether abuse had ever occurred was reasonable. This issue had been litigated at the jurisdiction/disposition hearing and the findings and orders made at that hearing were long final and not relevant to the section 366.26 hearing issues. The court allowing county counsel to question witnesses on their knowledge of the allegations that were found true at the jurisdictional/dispositional hearing was also reasonable, as such questioning was relevant to witness credibility.

On appeal, mother frames Dr. Al-Agba's potential testimony as relevant to issues, not of whether K.S. was ever abused, but of whether the beneficial parent-child relationship exception applied. Her reply brief specifically outlines that medical evidence showing K.S. had "medical conditions unrelated to abuse" was relevant to (1) providing context for understanding K.S.'s behavior during visits as "certain behaviors were attributable to the child's underlying medical conditions rather than reflecting a lack of attachment to the parents" and (2) would have demonstrated mother's "understanding of and ability to address the child's special needs." We find this reasoning to be incongruent with the offer of proof given at the section 366.26 hearing, which appeared to be to prove the parents did not abuse K.S.—an issue that, again, went to long final jurisdictional and

dispositional findings and orders. We need not evaluate this additional offer of proof, as it was never presented to the juvenile court. (See *In re Mark C.* (1992) 7 Cal.App.4th 433, 444 ["Failure to make an adequate offer of proof precludes consideration of the alleged error on appeal."].) In any event, as to these issues, any exclusion of Dr. Al-Agba's proffered testimony was harmless, as mother was permitted to testify at length about her ability to care for K.S.'s special needs, and the court did appear to find K.S. and the parents had a beneficial relationship. As such, any testimony from Dr. Al-Agba was not likely to effect a more favorable result to the parents, and therefore its exclusion was harmless.

We note mother repeatedly argues the department was permitted to use "medical evidence" during the hearing resulting in "uneven" rulings that violated mother's constitutional rights but provides no specific citations to the record to explain what she is referring to. Briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Rule 8.204(a)(1)(C).) Allegations that are not supported by references to the record will be deemed forfeited. This court is not required to make an independent search of the record and may disregard any claims when no reference is furnished. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.) Because mother does not make adequate citations to the record, we reject this aspect of her claim of evidentiary error and any related due process claims without discussing it any further. We do note that to the extent mother is characterizing county counsel's questioning of witnesses using allegations found true at the jurisdictional/dispositional hearing as "medical evidence," we reject this characterization.[17]

---

[17] We also reject mother's brief contention that the court's evidentiary rulings constituted a "delegation of the court's independent judgment" to the department as to

31.

For the foregoing reasons, we conclude the court did not err by excluding Dr. Al-Agba's testimony.

## IV. Beneficial Parent-Child Relationship Exception

### A. Legal Background

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

A parent seeking to establish the beneficial parent-child relationship exception applies has the burden of proving by a preponderance of the evidence three elements to justify the application of the exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 632–633, 636–637 (*Caden C.*).)

whether the beneficial parent-child relationship exception applied. The case she cites in support—*In re N.V.* (2010) 189 Cal.App.4th 25—does not deal with an evidentiary ruling but with a juvenile court's review of a department's decision related to relative placement, and mother has not set forth a reasoned argument as to how the situation in *N.V.* is analogous to and/or should be applied to a juvenile court's evidentiary rulings. (See rule 8.204(a)(1)(B) [a brief must contain reasoned argument and legal authority to support its contentions or the court may treat the claim as forfeited].)

Here, the court found the parents met their burden of proving the first element and appeared to find they also met their burden of proving the second, and the department concedes these findings were supported by substantial evidence. Thus, we will focus on the third element.

In determining the third element, courts look at "whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid.*) Courts may consider whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

We review the third element for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

### B.    Analysis

As a threshold matter, we reject mother's suggestion the court applied the wrong burden of proof; this claim is directly contradicted by the record, as the court expressly noted it was applying the correct preponderance of the evidence standard.[18]

### 1.    The Court Did Not Abuse its Discretion by Determining That Terminating Parental Rights Would Not Be Detrimental to K.S. When Balanced Against the Benefits of Adoption

First, mother argues the court's analysis was substantively incorrect. She points to evidence in the record which supports her position, including the testimonies of Dr. Karimi, Gutierrez, and Harvey indicating K.S. had a strong attachment to the parents, and the parents' testimony regarding K.S.'s club foot condition. This line of argument ignores our standard of review. It was the juvenile court's role to weigh and consider the evidence presented, and we do not reweigh evidence on review; rather, we are looking for whether the court's determination was arbitrary or capricious.

Based on the record, we cannot determine that finding the third element was not met was not an abuse of discretion. Most of the evidence proffered by the parents to support their contention that K.S. would suffer harm was generalized and not specific to K.S. For example, Dr. Karimi testified that adoption always caused some harm. The court could have reasonably found social worker Harvey's testimony that K.S. would not suffer detriment was more persuasive and also considered the legislative preference for

---

[18]    We note this suggestion is based on an exchange during which parents' counsel incorrectly asserted at the close of the department's case-in-chief that it had not met its "very high, clear and convincing burden in this case, that there is no exception to adoptability." County counsel accurately responded that it was not the department's burden to show that an exception does not apply, noting that after the department proves adoptability, "[t]hat high burden is then placed on the party that is opposing the adoption." It appears somewhat disingenuous to infer county counsel was misleading the court when the parents' counsel was the party who made the incorrect statement of law and implied the incorrect standard of proof.

adoption in evaluating Dr. Karimi's opinion. The most particularized evidence of detriment offered by the parents was that K.S. would be cut off from medical information regarding his club foot condition, but this evidence did not compel the court to find the benefits of adoption were outweighed by this harm in the context of the entirety of the evidence. Weighing against applying the exception was the absence of evidence that K.S. expressed any emotional distress at the end of visits or when out of the parents' care. The section 366.26 report indicated he had been assessed for and was not in need of mental health services. By all accounts, K.S. was thriving despite only seeing the parents twice a month.

### 2. Mother Has Not Demonstrated the Juvenile Court Did Not Apply the Proper Legal Standard

Mother then points to several parts of the juvenile court's ruling she contends constituted legal error, none of which are persuasive.

First, mother asserts the court "improperly emphasized K.S.'s time in foster care, noting he had 'spent the majority of his life outside his home.' " Mother's assertion that K.S.'s time out of the home is an improper factor is patently incorrect. The court made this statement while analyzing the second element of the exception—whether a beneficial relationship existed. Our high court has expressly deemed the following factors proper for consideration in determining the second element: " '*[t]he age of the child, the portion of the child's life spent in the parent's custody*, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, italics added.)

Second, mother argues "the court appeared to require proof that the parental relationship outweighed the abstract benefits of adoption ('security, finality, stability')." This contention is a little puzzling. To support it, mother cites the following quote from

the court's ruling: "I've weighed and considered [the opinions offered at trial regarding detriment of severance of the relationship]. And the question then for the Court is, have the parents shown by a preponderance of the evidence that the harm of severing the relationship between [K.S.] and [the parents], does that harm outweigh the security, the finality, the stability, security of knowing where he'll always be, who will always be there, and that he'll be safe and secure." This statement tracks language from *Caden C.* (*Caden C.*, *supra*, 11 Cal.5th at p. 633 ["does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent]?'"].) We find the court understood and applied the proper legal standard.

Finally, mother points out the court did not "adequately consider evidence suggesting potential issues with the proposed adoption, particularly regarding K.S.'s specialized medical needs." Mother points to the evidence of the efforts the parents took to care for K.S.'s club foot condition and asserts "evidence showed regression in K.S.'s casting treatment after placement with the foster parents, requiring a return to serial casting due to 'poor brace compliance.' " Mother does not provide a citation to the record to support this assertion or that the foster parents caused any regression in K.S.'s condition or that any regression caused physical harm to K.S. In any event, there is no indication on the record that the court failed to consider all the evidence presented. There is also no evidence the prospective adoptive parents were not capable of taking care of K.S.'s physical needs as evidenced by the reports that K.S. was in good physical health and that the care providers took him to all his medical appointments and followed his required medical treatment. We note, contrary to mother's assertions, there is an indication on the record that any regression in K.S.'s condition may have been attributable to his relative care providers not following the treatment plan, and after he

was placed with his current care providers, he had since progressed from casts to "boots and bar."

For the foregoing reasons, we conclude the juvenile court did not err by declining to apply the beneficial parent-child relationship exception.

## **DISPOSITION**

The juvenile court's orders are affirmed.


                                                    DE SANTOS, J.

WE CONCUR:


PEÑA, ACTING P. J.


SNAUFFER, J.